# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### CINCINNATI DIVISION

|  |  |  |
|---|---|---|
| The State of Ohio, ex rel. | : | |
| Carrie Davis | : | |
| 8364 Royal Heights Drive | : | Case No. C-1-03-355 |
| Cincinnati, Ohio 45239 | : | |
| | : | Judge S. Arthur Spiegel |
| PLAINTIFF, | : | |
| | : | FIRST AMENDED |
| vs. | : | COMPLAINT FOR |
| | : | ANTITRUST VIOLATIONS |
| The National Football League, et. al. | : | *With Jury Demand* |
| | : | |
| DEFENDANTS. | : | |
| | : | |

## I. JURISDICTION

1.      This action arises under 28 U.S.C. §1331 (federal question jurisdiction), 15 U.S.C. §§1-2 (Sherman Antitrust Act), and 15 U.S.C. §15 (Clayton Act).

## II. OHIO REVISED CODE §§309.12 AND 309.13

2.      In the name of the State of Ohio, solely on behalf of the citizens of Hamilton County, Relator Carrie Davis initiates this action *"as if brought by the prosecuting attorney"* of that county, as authorized under Ohio Revised Code §§309.12 and 309.13.

3.      Under Ohio Revised Code §309.12 (Protection of Public Funds), the Hamilton County prosecutor may sue to recover damages arising from any contract involving county funds where the *"contract was procured by fraud or corruption . . . or . . . the terms of a contract made by or on behalf of the county are being or have been violated."* If the prosecutor fails to bring an action after a written request or is otherwise unable to

bring the action, Ohio Revised Code §309.13 allows a taxpayer to pursue the claim on the state's behalf.

4.     In November 2002, Ms. Davis brought a mandamus action against the Hamilton County Prosecutor to pursue all claims arising from the Paul Brown Stadium lease or to appoint a special prosecutor to prosecute them. Ethical constraints, however, preclude the county prosecutor from pursuing these claims. The prosecutor's office helped to negotiate and to draft the lease at issue here. Consequently, the Code of Professional Responsibility, which governs the conduct of lawyers in Ohio, precludes the prosecutor's involvement in this action under Disciplinary Rule 5-101(B). In a letter to the Hamilton County Commissioners on April 15, 2003, the Hamilton County Prosecutor's Office acknowledged this conflict. Because the county prosecutor has not, and cannot, bring these claims, Ms. Davis brings this action under §§309.12 and 309.13.

## III. THE DEFENDANTS

5.     Defendants are the National Football League, an unincorporated association, and the owners of the league's 32 professional football teams from communities across America. NFL teams are separately owned through varying forms of legal entities, including sole proprietorships, close corporations, and partnerships. By agreement of league members, though, only the Green Bay Packers are permitted to be a publicly traded company.

6.     Because of the prohibition against public ownership, information about the league—its constitution and bylaws, its finances, and its operations—are not readily available to the public. Before filing the original complaint in this action, former relator Todd Portune requested information from the league and the Bengals, shared with them

2

detailed factual and legal analyses of Hamilton County's potential claims, and invited league and team representatives to meet with him. Mr. Portune wanted to ensure that good ground existed for these claims and to permit the NFL and Bengals the opportunity to challenge these allegations based upon information not available to Mr. Portune. In response, the Bengals and the NFL ignored his requests for information, declined to comment on the merits of the county's claims, and refused to meet with him.

7.      Without the benefit of information only recently available through the media and Internet, the State of Ohio could not have brought these claims before now. The State of Ohio has been forced to bring the claims that follow based solely upon the information available to him, which—absent information that the NFL and Bengals have thus far refused to disclose—support the claims in this complaint. The NFL has a policy of refusing to disclose financial data, even to governmental bodies negotiating with team owners over new stadiums. Therefore, information essential to uncover these claims was not available until May 2001 when the Los Angeles Times newspaper published detailed financial information about the NFL's finances initially disclosed as evidence, but later sealed from public disclosure, by the court in a lawsuit between the Oakland Raiders and the NFL.

8.      The league recently explained its nondisclosure policy while responding to requests for financial data from the Citizens' Task Force on Chargers Issues. The San Diego City Council formed the task force to advise the council about whether the city should build a new stadium to prevent the San Diego Chargers from leaving the city. As it had in Hamilton County, the NFL claims that San Diego needs a new stadium to be competitive and viable. The task force requested financial data to support this contention.

9.    Frank Hawkins, the NFL's Senior Vice President for Business Affairs, responded to the request on November 18, 2002, saying that "[the NFL is] strongly opposed to NFL Clubs 'opening up their books' for the public record as part of public stadium campaigns." After the task force repeated its request, the NFL's outside counsel, Allan G. Mutchrtik of Skadden, Arps, replied on January 10, 2003 that the league would not share the information requested and noted that "the sharing of such information is unprecedented in the NFL. Other than unauthorized leaks to the press made in the Raiders lawsuit with the NFL and reports by the publicly owned Green Bay Packers—no NFL team has made such information public."

## IV. BACKGROUND

### OVERVIEW

10.    For the past decade, American communities have spent billions of dollars to attract or retain NFL franchises. By contract—specifically, the NFL Constitution and Bylaws among league owners and the collective bargaining agreement between owners and players—NFL owners share most revenues with each other and with players through revenue-sharing formulas. With these agreements limiting their profits, NFL owners have exploited the league's monopoly power to increase their personal profits through stadium deals generating revenues that, by and large, owners keep for themselves.

11.    NFL owners have structured the league to create an excess demand for teams among cities across the country. Owners keep league membership substantially lower than the number of cities or markets that can support an NFL franchise. By creating a system in which many cities that are viable franchise sites do not have teams, NFL

4

owners have enormous leverage through competitive bidding for any franchise that becomes available, whether by expansion or relocation. As a consequence, just as NFL player salaries skyrocketed through player free agency, taxpayer subsidies for stadium construction skyrocketed because of "franchise free agency."

## FRANCHISE FREE AGENCY

12.     Franchise free agency is the by-product of (a) the NFL's decision to expand by two teams in 1992 and (b) the collective bargaining agreement with the NFL Players Association in 1993 that created a player salary cap in exchange for player free agency. After NFL players filed antitrust claims against the NFL in the late 1980's to attack the league's restriction on player movement—and, hence, player salaries—the league turned to league expansion as a means to generate new revenue in case players won their antitrust claims. In May 1991, one day before a key court decision allowing the players' antitrust claims to be tried, the league voted to expand by two franchises as a first step to deal with the inevitability of a salary cap and revenue sharing with players.

13.     The salary cap and revenue sharing with players became a reality with the 1993 collective bargaining agreement. The cap actually involves a range of two figures—the lowest to highest amounts an owner may spend each year on player salaries—calculated as a percentage of revenues shared among league owners. Owners share national broadcast fees, ticket revenues, and licensing fees from NFL Films and NFL Properties. Since the cap on player salaries likewise capped an NFL owner's profits from shared revenues, the owners focused on increasing *non*-shared revenues. By far the most lucrative non-shared revenues are those derived from stadium deals: luxury boxes, club seating, concessions, advertising, and parking. League expansion in 1992 was primarily

designed to help owners extort the best stadium deals from their host cities or, if these cities balked, from cities anxious to attract an NFL franchise.

14.    Not surprisingly, the NFL discovered that many cities without franchises were anxious to field teams. Just weeks before the players would prevail in their antitrust suit, league owners narrowed the candidates for the two expansion franchises to five cities that had either built—or secured financing to build or renovate—stadiums with luxury boxes and premium seating that could generate significant stadium revenues: Baltimore, Charlotte, Jacksonville, Memphis, and St. Louis. Through this process, the NFL not only identified viable cities for its new expansion teams, but also had several other communities with financing in place for existing NFL teams to use as leverage to extract better stadium deals.

## MUSICAL CHAIRS

15.    Franchise expansion enabled NFL teams to play a highly lucrative game of musical chairs throughout the 1990's. After Charlotte and Jacksonville were awarded franchises in 1993, the "losing" bidders—Baltimore, Memphis and St. Louis— immediately tried to attract NFL franchises. Virtually every NFL franchise, including the Cincinnati Bengals, used the opportunity to threaten to leave their host communities unless the franchise received a state-of-the-art stadium.

16.    Unfortunately, existing stadium leases were an impediment to franchise movement. This, however, did not deter NFL owners. Owners looked for creative ways to declare that their host communities had breached the lease, freeing the teams to move. For example, while attending an NFL owners meeting in March 1995 to discuss franchise movement, Bengals owner Mike Brown declared that the City of Cincinnati had breached

its lease agreement for Riverfront Stadium by paying $167,000 in concession receipts one week late. Even though the City did not cause the late payment and the team suffered no significant damage from the brief delay, the Bengals put themselves on the market.

17. In another owners meeting the following month, April 1995, the NFL approved the Los Angeles Rams move to St. Louis. Mike Brown announced that moving the Bengals to Los Angeles to replace the Rams was an option if the Bengals didn't get a new stadium. The following month, NFL owners created the New Stadium Construction and Renovation Committee with Jerry Richardson as chairman. At some point, the NFL also hired a stadium consultant, Rick Horrow, to assist owners interested in seeking new stadiums. Horrow would play a key role in helping the Bengals secure a new stadium deal in Hamilton County.

18. Meanwhile, the NFL's new stadium committee chairman did his part. In an interview with the Cincinnati Enquirer on May 24th, Jerry Richardson sent a message to Hamilton County: "We have the most popular sports franchise in the world and there's only 30 of them. There are a lot of places that want one." Within the next month, Mike Brown visited one such city, Baltimore, to discuss relocation. Baltimore offered the Bengals a $200 million stadium, renovated practice facility and $44 million in income. Weeks after visiting Baltimore, on June 24th, Mike Brown wrote to Cincinnati political leaders with an ultimatum: either agree to a new stadium deal within 5 days, or the Bengals would begin exclusive negotiations with Baltimore to relocate the franchise. Community leaders knuckled under the threat, meeting the deadline with a stadium deal requiring an increase in the county sales tax.

19.     While the Bengals' threat to move provided the greatest leverage to force a new stadium deal, the team offered a business rationale—one that would later prove false—to justify its move and insulate itself from antitrust liability:  The Bengals needed a new stadium to be competitive and viable.  The Bengals thus lobbied for the new stadium by appealing to the community's desire to improve the team without putting the franchise into bankruptcy. NFL owners understand that voters are much more apt to supply additional revenue to their teams if the money goes toward players, rather than increased profits.

20.     This newspaper passage recounts comments from Bengals owner Mike Brown that were typical of statements he and other Bengals' officials made leading up to the stadium vote and the lease signing:

> *Concerned that his subtler pleas have been met mainly with civic apathy, Brown is now leading with his leverage.  He observed that three candidate cities [for NFL expansion] will be disappointed when the National Football League awards its second expansion franchises Nov. 30, and that he would be inclined to contact them if he is unable to make progress on the home front.*

> *Brown contends that changes in the NFL's collective bargaining agreement with the players, negotiated under the threat of a court-imposed settlement, will hurt the Bengals both on the scoreboard and at the bank.*

> *The Bengals remain profitable, despite their 0-7 record, but Brown's fear is that free agency will shortly drive his payroll near or past the point of profitability.*

> *                              * * ***

> *"If this were just dollars and cents, there's no decision," Brown said during an interview at Spinney Field, the Bengals' practice facility. "I like being in Cincinnati. I feel part of the community and we've been happy.*

> *"But I'm faced with a difficult situation. Things have changed. Now we are saying we think we might have a problem, and we may be forced to so something about our problem. We'd like to do it here."*

21.    *"Things have changed."* Brown unequivocally represents that something has taken place—free agency and the ensuing competition for players—that will force the Bengals to choose between losses on the playing field or at the bank. These claims, though, were not true. In the years after free agency, but before the new stadium, the Bengals paid salaries comparable to other NFL teams yet stayed among the most profitable teams in professional football.

22.    As the Bengals succeeded in convincing community leaders to build a new stadium, the NFL in July approved the Raiders move from Los Angeles to Oakland, a move motivated primarily to increase the Raiders' stadium revenues. With Baltimore and Tennessee still in play, other NFL franchises threatened their communities with relocation to force stadium deals. By November 1995, the Cleveland Browns and Houston Oilers committed to move to Maryland and Tennessee, respectively, again creating vacancies for teams to use as leverage in their stadium negotiations.

## THE NFL GRAPPLES WITH ANTITRUST CONCERNS

23.    While NFL franchises played this game of musical chairs, the NFL grappled with antitrust problems arising from franchise free agency. Over the last two decades, the NFL has become embattled in antitrust litigation. One of the league's own—the Oakland Raiders—successfully sued the NFL in the 1980's for violating federal antitrust laws. The last real competitor to the NFL, the ill-fated USFL, also won an antitrust case against the league. Finally, NFL players were able to force the league to agree to free agency through antitrust litigation. In recent years, the league's antitrust concerns have shifted to stadium-related issues.

24.    To insulate itself against antitrust claims related to team relocation, the NFL enacted bylaws to restrict team movement. The NFL fashioned its relocation rules after suggestions from the appeals court reviewing the antitrust finding in the Raiders case. The league's relocation rules require any franchise interested in relocating to apply to the league for permission by a three-fourths vote of team owners. The interested team must justify a proposed move by filing a "statement of reasons" meant to trigger an in-depth analysis of the implications that any move will have on the league and the fans.

25.    Under antitrust law, restraints of trade are unlawful.  Under some circumstances, however, such restraints may be permitted under the "rule of reason." The rule balances the anticompetitive and procompetitive consequences of the challenged practice, in this case, limiting the number of NFL franchises to increase leverage in stadium negotiations. To justify threats to relocate, NFL owners argued that revenues from new stadium were necessary to remain competitive and viable. The owners—including Bengals ownership—claimed that the 1993 collective bargaining agreement rendered most NFL stadiums "economically obsolete," contending that new sources of revenue were necessary to compete for players while keeping teams profitable. This was not true, merely a subterfuge to avoid antitrust claims from communities facing the threat.

26.    Rather than embrace the league's relocation rules—in particular, the requirement that owners justify the move under NFL guidelines—owners flaunted them in their quest for stadium revenue. In 1995 alone, four teams agreed to move their teams to greener pastures:  the Rams from Los Angeles to St. Louis, the Raiders from Los Angeles to Oakland, the Browns from Cleveland to Baltimore, and the Oilers from Houston to

Tennessee.  Without meaningful enforcement, the rules did nothing to bring the league within antitrust compliance.

27.     By 1995, the NFL was concerned about antitrust claims on three fronts.  First, the league feared that precluding owners from exploiting the NFL's monopoly power through relocation could trigger claims from owners, like the Raiders lawsuit in the 1980's.  In fact, during 1995, Raiders owner Al Davis again threatened to sue the NFL because the league attempted to block the Raiders return to Oakland.  Second, the league faced claims from cities seeking NFL franchises.  In 1995, for example, the St. Louis Convention and Visitors Center sued the league alleging that it was forced to enter into an extortionist lease with the Rams because the NFL suppressed competitive bidding among league franchises for the TransWorld Dome.  Finally, NFL host cities in danger of losing their franchises, like Cincinnati, posed another antitrust threat for the league.

28.     To address these antitrust concerns, the NFL filed a declaratory judgment action in August 1995 against the Raiders seeking a declaration that the league's relocation rules insulated the NFL from antitrust claims. (The lawsuit was later dismissed as moot.)  That same year, the league lobbied Congress for an antitrust exemption to protect the league from claims relating to franchise relocation. Because of franchise movement, Congress was contemplating legislation throughout 1995-96 to stop the bidding war among communities for NFL franchises. In November 1995, Commissioner Paul Tagliabue appeared before the Subcommittee on Antitrust, Business Rights, and Competition of the Senate Committee on the Judiciary, lobbying for the antitrust exemption.

29.     The commissioner expressed his exasperation for NFL ownership's blatant disregard for the league's own antitrust rules:

> *As a result, some clubs—all of which had agreed to be bound by the league's internal procedures for determining franchise location—have been persuaded to abandon their commitments to the league and their fans, and unilaterally to move the league's operations to a new location. If a league seeks to enforce its contractual rights against such moves, it faces substantial antitrust risks . . .*

30.     Despite several different legislative proposals, Congress ultimately did not adopt any legislation specifically relating to NFL franchise relocation and did not grant the NFL's request for an antitrust exemption.  In June 1996, though, the Ohio General Assembly passed a law (Ohio Revised Code §9.67) concerning stadiums. The legislation protects public investment in sports stadiums by forcing any team owners who have leased a public facility to offer their franchise for sale to the local political subdivision before relocating the team.

31.     The NFL, however, has adopted rules prohibiting public ownership of franchises. All teams are privately owned, except for the Green Bay Packers. The rules against public ownership prevent NFL host cities from directly investing in their teams to keep their franchises from moving. The investment of the NFL host community—like Hamilton County, which has invested over $500 million to keep NFL football in Cincinnati—is at the mercy of its local franchise.

## THE CINCINNATI STORY

32.     As the NFL grappled with antitrust concerns in 1995, the Cincinnati Bengals succeeded in convincing Cincinnati City Council and Hamilton County Commissioners to build the team a new home. News accounts at the time suggested that a county commissioner devised the financing plan to fund the stadium. But in his book, *When The Game Is On The Line*, Rick Horrow, takes credit—along with Bengals owner, Mike

Brown—for proposing the sales tax increase with set asides for property tax rollbacks and schools that would be used to finance stadium construction:

> I had asked in the poll [of Hamilton County voters] about many needs aside from sports. Residents were concerned about schools, crime, jobs, kids leaving town to go other places after they finished their education. "Mike," I said, "this campaign will not be about sports."
>
> We [he and Mike Brown] talked about a specific financing mechanism, property tax relief, and repair of school buildings. We decided to propose a sales tax that would be paid, to a substantial degree, by visitors—people who lived in other Ohio towns, or Kentucky and Indiana, people who don't vote but who come to town for big events.

33.    A citizens group in Cincinnati, however, led a successful campaign forcing the sales tax increase to be put to a public vote, set for March 1996. With the help of Rick Horrow, the Bengals helped to organize and to finance the pro-stadium campaign— Citizens for a Major League City—advocating the sales tax increase. This telling account, in Mr. Horrow's own words, describes their strategy:

> In fact, the marketing literature said, "It's not about sports." I emphasized public schools, property tax relief, the prospect of new jobs, and the estimated $295 million annually pumped into the local economy. Brochures featured a photograph of a wholesome boy, hat tilted on his head, with a milk stain around his mouth. The milk, then, became the carrot, the promise of the right community values. The stick was a moving van in the night: a message subtly but clearly put forth—that if the local population showed indifference to the proposal, the Cincinnati Bengals could become the Cleveland Bengals. It wouldn't take much to lure the team to a new stadium up the highway."

34.    In the meantime, the NFL helped to ensure that the Bengals could move to Cleveland. Once the Browns owner agreed to move his team to Baltimore, the City of Cleveland sued the NFL and the Cleveland Browns over the team's move to Baltimore. On February 9, 1996, the NFL settled with the city, agreeing to help pay for a new stadium and to place an NFL franchise in Cleveland. During negotiations, the Cleveland

mayor—Michael White, a staunch opponent of the NFL's abuse of its monopoly power to shake down cities for new stadiums—pressed for an agreement from the league to preclude the Bengals from using a move to Cleveland as part of stadium negotiations with the people of Cincinnati. The NFL refused to agree to this condition.

35.    Instead, with the sales tax referendum one month away, the NFL put the Bengals at the top of the list of candidates to move to Cleveland. Faced with the threat of the team's move, the citizens of Hamilton County approved the sales tax on March 19, 1996. Even though the County now had a funding source for the new stadium, the Bengals in the months to come would use the threat of moving to negotiate the most favorable lease terms in professional sports.

36.    For example, in March 1997, Cincinnati city council members proposed a plan to increase Cincinnati's admission tax and extend its earnings tax to visiting entertainers and sports professionals. The plan was designed to fulfill the city's pledge to Cincinnati Public Schools to provide $100 million over 20 years as part of the original deal for the new stadium.  Bengals' management threatened to kill the stadium deal unless city council abandoned the proposal.  As a result, the proposal died and left the city's commitment to the Cincinnati Public Schools without funding.

37.    The Paul Brown Stadium lease was ultimately signed in May 1997.  Grossly one-sided in the Bengals' favor, the team owes nominal rent, receives virtually all stadium-related revenues, and pays essentially no construction, operations, maintenance or improvement costs. After paying $454 million to build the stadium, Hamilton County taxpayers will receive just $10 million in today's dollars from stadium revenues to pay

14

$209 million, again in today's dollars, for Bengals' expenses and stadium operations and maintenance costs over the next 33 years.

## THE LEAGUE'S SUCCESS STORY

38.     The Bengals were not the only NFL franchise to use the league's monopoly power to coerce new stadium deals.  In the 1990's and the early part of this decade, the vast majority of NFL franchises moved into new or renovated stadiums under leases that guaranteed them almost all stadium revenues at relatively little expense. Several franchises have stadiums under construction, or financing secured to build new stadiums, scheduled to open within the next few years. All told, since the early 1990's, the NFL has forced communities across America to pay over $3.5 billion to publicly subsidize stadiums whose primary purpose is to make wealthy NFL owners even wealthier.

## V.  THE ANTITRUST CLAIMS

39.     The NFL and its member teams, including the Cincinnati Bengals, have violated the Sherman Antitrust Act (15 U.S.C. §§1-2), the Clayton Act (15 U.S.C. §15), and the Ohio Valentine Act (R.C. §1331.01) by forming an unlawful trust to restrict trade and to prevent competition among professional football franchises. Under 15 U.S.C. §15 and R.C. §1331.08, any person injured by an unlawful trust may recover treble damages and litigation costs. On behalf of Hamilton County, the State of Ohio, through Relator Carrie Davis, brings this claim against the NFL and all its member teams for ongoing violations of these federal and state antitrust laws.

40.     In 1996, when the NFL conspired with the Cincinnati Bengals to convince voters to approve a sales tax hike for a new stadium, the league's members had enacted strict rules to limit the number of franchises. The primary purpose for these rules was to enhance the value of existing franchises by preventing competition. NFL teams, including the Bengals, took advantage of this scarcity of NFL franchises solely to extort huge public subsidies through lucrative stadium deals.

41.     NFL franchises, like the Cincinnati Bengals, misled their host communities by arguing that existing stadiums were "economically obsolete" when, in fact, teams could have paid for players under the 1993 collective bargaining agreement while staying profitable.  Through these misrepresentations and the scarcity of franchises, the league and its owners have violated antitrust laws by forcing their host cities to build new stadiums or renovate existing stadiums on extremely favorable lease terms that could not have been negotiated without the NFL and its owners' unlawful trust activities.

42.     NFL teams, including the Bengals, have also unlawfully restricted competition under the antitrust laws by requiring that their stadium leases prohibit any other professional football team from using these stadiums. Otherwise, governmental entities, like Hamilton County, that own football stadiums could help pay for them by endorsing the creation of competing professional football leagues. Thus, lease provisions allowing only NFL franchises to use these stadiums restrict competition to the detriment of communities like Hamilton County.

43.     Furthermore, the NFL has committed antitrust violations by adopting rules against public ownership to ensure that existing NFL owners have absolute control over team placement and movement. These rules contravene the public policy, reflected in Revised

Code §9.67(B), promoting public ownership of sports teams to prevent a team from relocating when it has benefited financially from a tax-supported stadium. Because of NFL restrictions against public ownership and the scarcity of professional football teams, local governments cannot protect their significant public investment in an NFL franchise by purchasing the franchise to prevent its relocation. For example, instead of using the $450 million in sales tax revenue used to construct Paul Brown Stadium, Hamilton County could have used this revenue to purchase the Cincinnati Bengals to keep the team in Cincinnati.

44.     Finally, although the NFL adopted rules specifically to prevent antitrust violations, the league has permitted teams, including the Cincinnati Bengals, to disregard these rules. Rather than encourage compliance with these rules, the NFL used them as a subterfuge to avoid antitrust scrutiny of their efforts to secure new stadiums for franchise owners. Instead, the NFL supported the Bengals' efforts—including its threats to relocate—without requiring that the team adhere to rules meant to ensure compliance with antitrust laws.

45.     The citizens of Hamilton County were willing to build a new stadium for the Cincinnati Bengals and agree to lease terms that allowed the franchise to field a competitive team while remaining profitable. Hamilton County residents never intended, however, to spend more than a half billion dollars merely to increase the Bengals' profits or to increase the franchise's value. Yet, the cumulative effect of the NFL's antitrust violations forced Hamilton County to pay money far more to build Paul Brown Stadium and to agree to more onerous lease terms to keep the Bengals in Cincinnati than a marketplace free of these trade restraints would have demanded.

## VI. PRAYER FOR RELIEF

Plaintiff The State of Ohio, through Relator Carrie Davis, asks that the court:

(a)     Declare that the Paul Brown Stadium lease is voidable at Hamilton County's discretion;

(b)     Grant compensatory and punitive damages in excess of $200 million dollars as damages against the NFL and all member teams, tripling these damages if the court finds an antitrust violation under the Sherman Antitrust Act, the Clayton Act and the Valentine Act;

(d)     Award Plaintiff its attorney fees and litigation costs; and

(e)     Order such other relief as the court deems just.

Respectfully submitted,

Robert R. Furnier (0012701)
Donyetta D. Bailey (0072433)

**FURNIER & THOMAS, LLP**
One Financial Way, Suite 312
Cincinnati, Ohio 45242
Telephone: (513) 745-0400
Facsimile: (513) 792-6724
Email: rfurnier@FandTLaw.com
         dbailey@FandTLaw.com

Attorneys for Plaintiff The State of Ohio, ex. rel Carrie Davis

## JURY DEMAND

Plaintiff The State of Ohio demands a jury trial of all claims.

## CERTIFICATE OF SERVICE

The foregoing was served on the following counsel this 17th day of September,

2003 by ordinary U.S. mail:

Robert G. Stachler
G. Jack Donson
Taft, Stettinius & Hollister LLP
425 Walnut Street
Suite 1800
Cincinnati, Ohio 45202-3957
Attorneys for Defendant Cincinnati Bengals, Inc.

| | |
|---|---|
| Kenneth F. Seibel | Gregg H. Levy |
| Mark J. Byrne | Steve E. Fagell |
| Jacobs, Kleinman, Seibel & McNally | James M. Garland |
| 1014 Vine Street, Suite 2300 | Covington & Burling |
| Cincinnati, Ohio 45202 | 1201 Pennsylvania Ave., N.W. |
| | Washington, D.C. 20004-2401 |

Attorneys for Defendant National Football League
and the remaining NFL defendant teams.