UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| HAMILTON COUNTY BOARD | : | |
| OF COUNTY COMMISSIONERS, | : | NO. 1:03-CV-00355 |
| | : | |
| Plaintiff, | : | |
| | : | **OPINION AND ORDER** |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NATIONAL FOOTBALL LEAGUE, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

On May 16, 2003, this case was first filed against the National Football League (the "NFL"), the Cincinnati Bengals, Inc. (the "Bengals"), and the remaining thirty-one NFL member teams, alleging violations of state and federal antitrust laws (doc. 1). By subsequent amendment, the Hamilton County Board of County Commissioners (the "Board") was substituted as Plaintiff in this action (doc. 57). Between April 29, 2005, and June 14, 2005, the parties filed and fully briefed a number of summary judgment motions (docs. 120, 121, 123, 124, 125, 126, 127, & 128). In particular, the parties filed cross-motions for summary judgment on the issue of whether the statute of limitations on Plaintiff's antitrust claims expired prior to the filing of this lawsuit (docs. 123, 127). On June 15, 2005, the Court held a hearing on these latter motions. The Court delayed deciding the motions when the parties advised they were pursuing settlement negotiations. With

this in view, the Court allowed a court-appointed mediator, of the parties' choice, to assist them in arriving at an amicable resolution of this matter.  On October 12, 2005, the mediator informed the Court that the parties were deadlocked and the mediation process concluded.  Subsequent to this, the Court held a number of meetings with the parties as a last resort, to determine whether this litigation could be resolved short of adjudication on the question of the statute of limitations.  On January 25, 2006, the parties informed the Court that settlement would not be possible.

On January 30, 2006, Plaintiff filed a Motion for Leave to File A Supplemental Memorandum Supporting its Request for Rule 56(f) Relief and to Stay Summary Judgment Proceedings (doc. 180), to which Defendants responded (doc. 182), and Plaintiff replied (doc. 185).  In its Motion, Plaintiff requested another hearing on all pending motions and issues (doc. 180).  However, the Court does not see how the information sought by Plaintiffs would be relevant to the issue of the antitrust statute of limitations. Consequently, the Court DENIES such motion and DENIES Plaintiff's request for another hearing in this matter (doc. 180).

For the following reasons, the Court DENIES Plaintiff's motion for summary judgment on the antitrust statute of limitations issue (docs. 127 & 128), and GRANTS Defendants' cross-motion on the same issue (doc. 123).  Because the Court is dismissing the federal

antitrust lawsuit on the grounds of the statute of limitations, the Court further finds it appropriate to DECLINE supplemental jurisdiction over the remaining state law claims in the case, namely Plaintiff's pending claim for fraud and Defendants' counterclaims.  The Court DISMISSES such claims WITHOUT PREJUDICE.

## I. RELEVANT PROCEDURAL HISTORY

On February 9, 2004 – while Hamilton County taxpayer Carrie Davis was still the named Plaintiff in this action – this Court denied a motion to dismiss filed by the NFL, the Bengals, the San Francisco 49ers, Ltd., and the Cleveland Browns, LLC (hereinafter, the "moving Defendants") pursuant to Fed. R. Civ. P. 12(b)(6).  Among the grounds advanced in that motion, these Defendants contended that the four-year statute of limitations applicable to federal antitrust claims had expired, thus barring this lawsuit.  Although the Court concluded that the statute of limitations began to run as of the signing of the stadium lease in May 1997 and that, accordingly, four years had indeed passed prior to the filing of this lawsuit, it also found that the limitations period may have been tolled by the doctrine of fraudulent concealment.  The Court specifically noted that Ms. Davis's Complaint repeatedly alleged that "Mike Brown, the Bengals, and the league intentionally and repeatedly misstated the Bengals' financial position or, at best, made misleading statements that led to such an inference" (doc. 27).  Based upon these allegations –

and solely upon these allegations – the Court concluded that Davis had sufficiently pled fraudulent concealment such that it was inappropriate to dismiss the case pursuant to Fed. R. Civ. P. 12(b)(6).  It held, in relevant part:

> Far from being "[m]ere silence...[absent any] duty to speak," Davis alleges that they made affirmatively fraudulent or misleading statements regarding the Bengals' financial position that would necessitate moving the team to another locale. Pinney Dock, 838 F.2d at 1472. Davis unambiguously avers that as a result of the league's policy against releasing financial information, she was unable to learn the details of the league's finances until 2001; only then, when they were briefly revealed during a lawsuit, was a newspaper able to obtain and disseminate the information. She also notes that, following this revelation, the Bengals and the league continued rebuffing any efforts to obtain and discuss their financial information. In sum, she alleges that Brown, the Bengals, and the NFL repeatedly and continuously misstated and concealed their financial position from 1995 until the present day.
>
> Furthermore – "fraudulent concealment" aside – it cannot be ignored that, without this knowledge, no antitrust claims could arguably arise; the "rule of reason" might well serve to prevent antitrust liability even though all of the other necessary predicates were known to be satisfied. To hold that the statute of limitations is not tolled in some fashion under these circumstances would only encourage potential plaintiffs to bring suit without appropriate foundation for fear of losing their antitrust claims to the passage of time. This Court will countenance no such effort. Contrary to the moving Defendants' assertion that these claims have not been pleaded with sufficient particularity, this Court finds, accepting the allegations as true and applying the Conley standard of review, that the

-4-

> "allegations are sufficient to overcome this
> motion to dismiss." <u>Louis Trauth Dairy, Inc</u>.,
> 856 F. Supp. at 1238.

(doc. 27).

Since issuing this Order, a number of events have occurred in this case. First, and undoubtedly most significant, the Board has been substituted as Plaintiff. As a result, the focus and tenor of the analysis under the fraudulent concealment doctrine necessarily changes. For example, rather that reviewing what a taxpayer would have known regarding the negotiation and execution of the stadium lease and the Bengals's underlying financial condition, the Court must examine and carefully consider what the Board knew in negotiating and executing the lease, the sole item that the Plaintiff complains violated the federal antitrust laws. Similarly, under the appropriate legal standard, the Court must focus on when the Board was in a position when it either knew or should have known of the underlying charges in light of its experience – and its members collective knowledge – of the history of antitrust claims in the NFL.

Second, the standard of review has necessarily changed. While in the previous motion the Court was obligated to deny the motion to dismiss "unless it appear[ed] beyond doubt that the plaintiff [could] prove <u>no</u> set of facts in support of [its] claim which would entitle [it] to relief," the Court now must focus on the actual evidence that the Plaintiff might proffer at trial to

support its contention that the statute of limitations should be tolled.  Conley v. Gibson, 355 U.S. 41, 46 (1957).  Over the last year, the parties have engaged in extensive and often contentious discovery.[1]  A wealth of materials has been submitted to the Court by all of the parties arguing this issue in the currently pending motions, serving to provide great insight into and substantial detail about the negotiations and resulting bargain that forms the core of the dispute.  Of particular note, the parties have taken the depositions of all of the individuals representing or otherwise advising Hamilton County (the "County") in the negotiations, including the Board members[2] who either executed the "Memorandum of Understanding" between Hamilton County and the Bengals or otherwise voted to approve the lease now at issue.  Accordingly, the parties have had every opportunity to develop the factual record relevant to the determination of whether fraudulent concealment existed – or does not exist – as a matter of law in the instant case or whether

---

[1] Although a number of discovery issues among the parties still exist, the parties to the instant motion represented to the Court in a conference call that no additional discovery was necessary to support or otherwise defend against the instant motions for summary judgment.

[2] The Plaintiff submits a substantial amount of evidence about what Todd Portune knew or suspected at the time, as well as his thoughts about what the Board would have done if the members had known particular facts about the Bengals's operations. Judicious as his thoughts might be, Mr. Portune's thoughts, opinions, and speculation are entirely irrelevant to this analysis.  He was not on the Board at the time that the lease was negotiated or executed.

it may present a question of fact requiring resolution by a jury. Appropriately enough, the Court begins by establishing the proper legal standard for deciding the instant motions and then proceeds with an analysis of the facts as established by the evidence submitted by the parties.

## II. APPLICABLE LEGAL STANDARD

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir.1992)(per curiam).  In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir.1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)(internal quotation marks omitted).

The process of moving for and evaluating a motion for

summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled.  First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of  material fact[.]" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>LaPointe</u>, 8 F.3d at 378; <u>Guarino v. Brookfield Township Trustees</u>, 980 F.2d 399, 405 (6th Cir. 1992); <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989).  The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. <u>See Barnhart v. Pickrel,</u> <u>Schaeffer & Ebeling Co., L.P.A</u>., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact.  <u>See</u> <u>Celotex</u>, 477 U.S. 317; <u>Anderson v.</u> <u>Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).  As the "requirement [of the Rule] is that there be no genuine issue of <u>material</u> fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for

summary judgment." Anderson, 477 U.S. at 247-48 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir.1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir.1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir.1989)(internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion

for summary judgment.  See McDonald v. Union Camp Corp., 898 F .2d 1155, 1162 (6th Cir.1990).  The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962).  Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion.  See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute.  See Matsushita, 475 U.S. at 587.  The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate.  See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991).

In addressing the instant motions, the Court need not determine the viability of the underlying antitrust claims; only a relatively limited procedural issue is to be resolved.  In sum, both parties contend that there is no question of material fact as to whether the statute of limitations on Plaintiff's antitrust

-10-

claims have expired.[3]  As noted previously, the statute of limitations established for federal antitrust actions is four years from the date of accrual of the action.  See 15 U.S.C. § 15b; Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971); Nilavar v. Mercy Health System Western Ohio, 142 F. Supp.2d 859, 867 (S.D. Ohio 2000)(Rice, C.J.).  A cause of action under the

---

[3] In the hearing held on the motion, however, Plaintiff's counsel Mr. Chesley seemed to retreat from this position.  As he closed, he indicated that the Court was required to review the entire record before it and that, regardless of a non-movant's failure to respond to a motion for summary judgment, that "the burden of establishing the nonexistence of a material fact dispute always rests with the mover" (doc. 171).  He then stated that:

> Your Honor, I submit, and Mr. Markovits will go into more detail, and I have listened to where [the Defendants] are coming from, but, Your Honor, to suggest that there is not one material fact on the issue of statute of limitations or fraudulent concealment, and that's why I used as an example the Baltimore situation to give clear evidence, and we are entitled to the inference in those things that flow

(Id.).  Co-counsel Mr. Markovits also appeared to retreat from the contention that the Board was entitled to summary judgment on this issue, instead apparently contending that there were facts supporting fraudulent concealment warranting submission to a jury: "What I'm about to show is that we do have the facts to put at issue their fraudulent concealment, their misrepresentations about economic viability, and all the other elements of fraudulent concealment" (Id.)  In his closing, Mr. Markovits, however, reiterated that Plaintiff believes it is entitled to summary judgment in its favor as to this issue.

statute accrues when the defendant commits an act violative of the statute that causes injury to a plaintiff's business or other economic enterprise. See Zenith, 401 U.S. at 338; Grand Rapids Plastics, Inc., v. Lakian, 188 F.3d 401, 405 (6th Cir.1999). Neither of these propositions is in serious dispute.[4] Accordingly,

---

[4] The Plaintiff also suggests, as its predecessor did in response to the earlier motion to dismiss, that it suffered no economic injury when the lease itself was signed; it contends that the actual antitrust injury occurred only after the Bengals began occupying the stadium under the terms of the lease and, therefore, that the statute of limitations would only begin to run at that time. If this proposition were accepted, then the filing of the instant suit would have occurred within the four year statute of limitations, and the issue of whether fraudulent concealment of the claim occurred would be entirely moot. Plaintiff, however, has advanced no argument that would cause this Court to reconsider its earlier ruling with respect to this issue. As it noted in its prior Order:

> [Plaintiff's] argument, however, seems foreclosed by applicable Sixth Circuit law. In general, "the focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts." Peck v. General Motors Corp., 894 F.2d 844, 849 (6th Cir.1990) (per curiam). Furthermore, although [Plaintiff] might attempt to frame it as a "continuing conspiracy" to perpetuate the antitrust injury, that opportunity seems foreclosed as well. An overt act that would reset the statute of limitations under this theory must be a "new and independent act that is not merely a reaffirmation of a previous act" and that "inflict[s] new and accumulating injury on the plaintiff." DXS, Inc. v. Siemens Medical Systems, Inc., 100 F.3d 462, 467 (6th Cir. 1996); see also Martinez v. Western Ohio Health Care Corp., 872 F. Supp 469, 472 (S.D. Ohio)(Rice, C.J.). Accordingly,

-12-

the Defendants insist that the applicable limitations period has
expired, whereas the Plaintiff insists – in accordance with this
Court's earlier decision on the matter – that the statute of
limitations has been tolled by the Defendants' fraudulent efforts
in concealing their wrongdoing under the antitrust laws.  Plaintiff

---

"even when a plaintiff alleges a continuing violation,
an overt act by the defendant is required to restart
the statute of limitations...." DXS, 100 F.3d at 467.
Accordingly, this "injury" – if it may be so framed –
occurred when the lease was executed.  This overt act
fixed the amount of compensation that the county would
receive; all that remained was the collection thereof.
These economic results are precisely the type of
"rippling effect" that the Peck court determined could
not serve as an "overt act" for statute of limitations
purposes.  Peck, 894 F.2d at 849.

(doc. 27). It is also worth noting that the evidentiary materials
submitted by the parties in this case clearly reveal that, under
the terms of the lease, Hamilton County had a number of immediate
obligations to prepare the stadium for occupancy by the Bengals.
It would be difficult to comprehend that – even accepting the
Plaintiff's argument as true – that such required expenditures
would not constitute an immediate economic injury as of the
signing of the lease.  In any case, the Board fails, despite the
wealth of evidence produced in this case, to articulate any
subsequent ground or additional "overt act" subsequent to the
signing of the lease by any of the Defendants that might arguably
have restarted the statute of limitations. Given that
shortcoming, the Court cannot substitute its speculation for
evidence in this case.  Because the "timing of the defendants'
overt acts [rather than] the timing of the plaintiff['s]
injuries. . .controls the statute of limitations issue," the
Court has little difficulty concluding that there is no question
that the statute of limitations began running as of the execution
of the lease.  Peck, 894 F.2d at 849.

-13-

alleges that the Defendants' efforts to conceal their scheme, financial condition, and league operations implicates the long-respected "fraudulent concealment" doctrine, which serves to toll the statute. See, e.g., Pinney Dock & Transport Co. v. Penn Central Corp., 838 F.2d 1145, 1465 (6th Cir. 1988). As the Supreme Court noted over a century ago,

> [t]he authorities are without conflict in support of the doctrine that where the ignorance of the fraud has been produced by affirmative acts of the guilty party in concealing the facts from the other, the statute [of limitations] will not bar relief provided it is brought within proper time after discovery of the fraud.

Bailey v. Glover, 88 U.S. (21 Wall.) 342, 347-48 (1874). Where a plaintiff is able to show fraudulent concealment of a federal antitrust claim, "the four-year federal statute of limitations begins anew from the time the plaintiff knew or should have known of the federal claim." State of Michigan ex rel. Kelley v. McDonald Dairy Co., 905 F. Supp. 447, 451 (W.D. Mich. 1995); see also Norton-Children's Hosp. v. James E. Smith & Sons, Inc., 658 F.2d 440, 445 (6th Cir. 1981); State of Ohio ex rel. Fisher v. Louis Trauth Dairy, Inc., 856 F. Supp. 1229, 1236 (S.D. Ohio 1994)(Spiegel, J.).

In the Sixth Circuit, a plaintiff relying upon this

-14-

doctrine must plead and demonstrate the following elements: (1) the defendant's wrongful concealment of his actions; (2) the plaintiff's resulting failure to discover the operative facts that serve as the basis of his cause of action within the appropriate limitations period; and (3) plaintiff's due diligence until discovery of the operative facts.  <u>See</u> <u>Pinney Dock & Transport Co. v. Penn Central Corp</u>., 838 F.2d 1145, 1465 (6th Cir. 1988); <u>Dayco Corp. v. Goodyear Tire & Rubber Co</u>., 523 F.2d 389, 394 (6th Cir. 1975).  It is also generally required – as with most issues in the law involving fraud – that some reliance on the false or misleading statements, however minimal, must have occurred.[5]

_____

[5] Although not addressed in the briefing, Plaintiff's counsel conceded this requirement during oral argument on these motions:

> THE COURT: Now it seems to me that to establish the claim of fraudulent concealment you have got two basic elements that have to be found.  First, what are the essential elements of a cause of action for fraud or fraudulent concealment?  And, secondly, when does the cause of action accrue so that the statute of limitations starts to run?  Can you address that?

> MR. MARKOVITS: Sure. The elements of fraudulent concealment are wrongful concealment by defendants, a failure of plaintiffs to discover the operative facts, and plaintiff's due diligence.  When – when it's – the fraudulent concealment doctrine tolls the statute of limitations.

With respect to the first element, the Sixth Circuit has noted that, in antitrust actions, plaintiffs must show some "affirmative acts of concealment" to satisfy the first requirement of the doctrine.  Pinney Dock, 838 F.2d at 1472; see also Wood v. Carpenter, 101 U.S. 135, 139 (1879).  Furthermore, the acts of concealment – considered against the backdrop of the action – must be wrongful.  See Louis Trauth Dairy, 856, F.Supp. at 1236.

---

THE COURT: And there's reliance in there, too, isn't there?

MR. MARKOVITS: Excuse me?

THE COURT: There has to be reliance by the person who claims he was snookered?

MR. MARKOVITS: That's not presented as an element, but presumably there has to be some reliance.  And that's the Dayco case out of the Sixth Circuit, Your Honor.  That's not the model instructions.  It's Sixth Circuit law.  And that's presumably what a jury would be instructed here.  So those are the elements of wrongful concealment.

(doc. 171).  The legal precision of the term "snookered" notwithstanding, Plaintiff has admitted that binding Sixth Circuit precedent also requires reliance upon allegedly fraudulent statements before fraudulent concealment may be established.  See, e.g., Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883, 891 (6th Cir. 2004); ADD.  While a grant of summary judgment in this case would be appropriate even were this element not required, it lends additional support to this Court's conclusion as explained infra.

-16-

As for the latter two elements, this Court has previously noted:

> in those fraudulent concealment cases where the courts have denied the plaintiffs the benefit of tolling of the statute of limitations, the courts repeatedly have focused on knowledge and due diligence....
>
> We find this emphasis on discovery and due diligence in the fraudulent concealment cases to be well taken. The bedrock threshold for granting the equitable tolling of the statute of limitations for fraudulent concealment must be whether a plaintiff knew or through due diligence should have known of the existence of his claims.

Id., 856 F.Supp. at 1238 (internal citations omitted). Accordingly, the Supreme Court and the Sixth Circuit have long held that

> a plaintiff who invokes the doctrine of fraudulent concealment will be held to stringent rules of pleading and evidence, and especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made.

Pinney Dock, 838 F.2d at 1465, quoting in part Wood v. Carpenter, 101 U.S. (11 Otto) 135, 139-40 (1879)(internal quotation marks and citation omitted).

Once satisfied, the Sixth Circuit has recognized that the

-17-

doctrine – as with any tolling doctrine – is to be narrowly applied, given that strong policy reasons exist to allow defendants to be free from stale claims.  See Hill v. United States Dep't of Labor, 65 F.3d 1331, 1336 (6th Cir. 1995); Ohio ex re. Fisher v. Louis Trauth Dairy, Inc., 856 F.Supp. 1229, 1236 (S.D. Ohio 1994).  The burden of establishing tolling – and, therefore, the elements of fraudulent concealment – lies with the Plaintiff seeking its protection.  See Pinney Dock, 838 F.2d at 1465.

## III. RELEVANT FACTUAL BACKGROUND

In its prior Order denying the motion to dismiss, the Court delineated in considerable detail the underlying facts in this case as pled in the Complaint and as supplemented by a limited number of subsequent filings by the parties.  Since then, however, the parties have engaged in extensive discovery efforts, and all have proffered a wealth of supporting materials in support of their respective motions for summary judgment on this issue.  While many of the basic facts contained in the Complaint have been demonstrated to be true, the contours of the events surrounding the negotiation and execution of the stadium lease have been detailed by the filings of the parties and the evidentiary materials submitted in support thereof.  Accordingly, it is necessary for the

-18-

Court to elaborate on and define the factual backdrop relevant to the determination of the instant motion as demonstrated by the parties. It draws these facts from the motions filed by the parties and the evidentiary materials filed by the parties in support thereof, as well as the Complaint,[6] to the extent that the facts therein appear uncontested by the parties.

A. The League

The National Football League is an unincorporated association consisting of thirty-two member football teams, situated in various host cities throughout the United States. Each team is independently owned, and they operate in varied forms, including sole proprietorships, close corporations, and partnerships. The league member team owners establish all operative guidelines and policies for the league. To some extent, however, it is inarguable that details regarding league operations and finances have historically been rather limited. Save one publicly-owned team, all of the member teams are privately held, and current bylaws prevent the addition of future publicly-owned

---

[6] Many of the background facts articulated in the Complaint – such as those surrounding the development of free agency and the efforts to secure new stadia across the country – are uncontested by the parties. As such – to the extent they are relevant – the Court incorporates them herein.

-19-

clubs. The Defendants have an absolute policy prohibiting the sharing or distribution of information regarding the league or member teams with outsiders, including the league constitution and bylaws, league and team finances, and league operations.

At this point, it would be beyond doubt to state that demand for professional football teams across the country – as a result of the limited number available and the NFL's unwillingness to expand the number of teams at a substantial rate – is high and the competitiveness among cities to secure a home team is fierce. As a result, the National Football League and its owners have been faced with allegations of antitrust violations and other illegal anticompetitive efforts in effectively monopolizing professional football in this country. In fact, the Plaintiff moved for summary judgment in its favor as to a number of these issues, contending that the question of whether "the NFL and its members possess monopoly power within...major league professional football in the United States" has long since been resolved by the federal courts (doc. 120). Moreover, a number of lawsuits across the United States have advanced these theories in a number of contexts, including the rights – or restrictions thereon – of teams to move to new host cities in pursuit of more favorable economic

-20-

conditions. The Plaintiff alleges that the NFL and its member teams used their monopoly power to move or expand in the 1990s, setting the stage for the instant dispute.[7] For the purposes of this motion, the Court can assume that these are the result of allegedly illegal uses of the Defendants' monopoly power.

B. The Bengals' Drive For Paul Brown Stadium

The Plaintiff alleges – without serious contention by the Defendants – that the collective bargaining agreement adopted in 1993, implementing a cap on team salaries and revenue sharing with players, was a response to some of these charges.[8] The Board contends that Mike Brown ("Brown"), owner of the Bengals, began his drive to extort more favorable lease terms and other economic

---

[7] Much of the Board's Complaint, as well as its briefing on the current motions, is spent detailing the intrigue leading up to its dispute with Defendants. While it may be relevant in demonstrating that the Defendants engaged in unlawful anticompetitive activities, the vast majority of such discussion is irrelevant to the issue of whether the statute of limitations has expired for the federal cause of action arising from such activities.

[8] Plaintiff argues that the salary cap each year is a percentage of revenues shared among league owners, such as broadcast fees, ticket revenues, and licensing fees. As a result, the Plaintiff argues that owners focused on expanding nonshared revenues to enhance their own bottom lines; stadium deals such as that at issue in this case was the primary method for doing so. This issue will be explored more fully infra.

benefits from Hamilton County.  Allegedly relying on the "rule of reason" exception to antitrust liability by noting that various economic realities – including free agency – rendered a new stadium and other concessions necessary if the team were to remain "competitive and viable," Brown began opining that other communities might be willing to assist the Bengals if Cincinnati were unable or otherwise unwilling to do so.  During a 1995 owners' meeting held to discuss franchise movement, Mike Brown declared that the City of Cincinnati had breached its lease agreement by tendering $167,000 in concession receipts from a game one week late, allowing the Bengals to seek relocation.  At a similar meeting one month later, Brown stated that if Cincinnati failed to provide him with a new stadium, moving the team to Los Angeles was a real possibility.

At that point, the rhetoric accelerated.  Jerry Richardson, in a _Cincinnati Enquirer_ interview dated May 24, 1995, noted the demand for NFL teams across the country: "We have the most popular sport franchise in the world and there's only 30 of them.  There are a lot of places that want one."  In June, Mike Brown visited Baltimore, claiming it was a potential future home for the team; in response, Baltimore offered to build the Bengals

-22-

a $200 million stadium and a practice facility and to ensure the team $44 million in income.  Armed with this offer, Mike Brown levied an ultimatum on June 24, 1995: If Cincinnati and Hamilton County did not agree to a new stadium deal within five days, the Bengals would begin relocation negotiations with Baltimore.  He contended that he would prefer to stay in Cincinnati; however, he insisted – consistent with the "rule of reason" exception to antitrust liability – that changing economic circumstances arising as a consequence of player free agency made the move necessary.  In sum, he contended, as virtually every other team owner had done previously, that a new stadium and the revenue it would offer were required if he were to continue to field a profitable and competitive team.

Faced with this threat, the Cincinnati City Council and the Hamilton County Commissioners had no alternative but to attempt to build a new stadium if they were to keep the team in Cincinnati. They proposed funding the enterprise with an increase in the Hamilton County sales tax containing set asides for property tax rollbacks and schools.[9]  This plan, however, was not without

---

[9] Carrie Davis, formerly taxpayer-Plaintiff, alleged that Brown and NFL stadium consultant Harrow actually devised the entire funding scheme in a manner that would rest most favorably

-23-

substantial opposition, and a citizens' group was successful in
forcing the proposed increase to a public vote in March 1996.

In response, the Bengals and the NFL found it necessary
to advance a pro-stadium campaign while, of course, ensuring that
the spectre of relocating the team elsewhere remained omnipresent.
A newspaper article summarizing an interview with Brown put it
thus:

> Concerned that his subtler pleas have been met
> mainly with civic apathy, Brown is now leading
> with his leverage.  He observed that three
> candidate cities [for NFL expansion] will be
> disappointed when the National Football League

---

with Hamilton County taxpayers.  In particular, she cites
sections from Rick Harrow's book, When the Game Is On the Line,
where he claims that Mike Brown and he, after conducting
extensive polls of Hamilton County voters, "decided to propose a
sales tax...."  They organized a campaign to enact this tax by
integrating it with other proposals that local voters would
support.  Harrow outlined the strategy in his book:

> In fact, the marketing literature said, "It's not about
> sports."  I emphasized public schools, property tax
> relief, the prospect of new jobs, and the estimated
> $295 million annually pumped into the local economy.
> Brochures featured a photograph of a wholesome boy, hat
> tilted on his head, with a milk stain around his mouth.
> The milk, then, became the carrot, the promise of the
> right community values.

(doc. 20).  The decision to emphasize these elements, rather than
the benefit of retaining the team, was the result of extensive
polling indicating that these issues were the ones truly capable
of motivating taxpayers to support the stadium issue.

-24-

awards its second expansion franchises Nov.
30, and that he would be inclined to contact
them if he is unable to make progress on the
home front.  Brown contends that changes in
the NFL's collective bargaining agreement with
the players, negotiated under the threat of a
court-imposed settlement, will hurt the
Bengals both on the scoreboard and at the
bank.

The Bengals remain profitable, despite their
0-7 record, but Brown's fear is that free
agency will shortly drive his payroll near or
past the point of profitability.

...

"If this were just dollars and cents, there's
no decision," Brown said during an interview
at Spinney Field, the Bengals' practice
facility.  "I like being in Cincinnati.  I
feel part of the community and we've been
happy.

"But I'm faced with a difficult situation.
Things have changed.  Now we are saying we
think we might have a problem, and we may be
forced to do something about our problem.
We'd like to do it here."

(doc. 128).[10]  By November 1995, both the Cleveland Browns and the

---

[10] In its motion, the Defendants contend that the Noerr-
Pennington doctrine prevents many, if not all, of the public
comments made by Bengals officials and representatives from being
considered as potentially misleading or fraudulent statements in
proving fraudulent concealment in this case.  Such doctrine
prevents statements made in the course of "attempt[ing] to
influence the passage or enforcement of laws" from serving as the
basis for violations of the federal antitrust laws.  Eastern
Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365

Houston Oilers had committed to move to new host cities, leaving two cities that would serve as immediate potential opportunities for the Bengals to leave Cincinnati.

Contemporaneously, however, the NFL's continuing entanglement with allegations of antitrust violations reached even the hallowed halls of Congress. NFL Commissioner Paul Tagliabue testified before numerous committees in an ultimately unsuccessful effort to secure for professional football the same statutory antitrust exemption currently afforded professional baseball. In fact, he even noted that the NFL itself was at risk of suffering antitrust litigation at the hands of its members arising from team efforts to relocate, as the Davis/Raiders case so presciently illustrated:

> As a result, some clubs – all of which had agreed to be bound by the league's internal procedures for determining franchise location

---

U.S. 127, 135 (1961). While this proposition is generally true, it has substantial limitations, some of which arguably apply to this case. F. Buddie Contracting, Inc. v. Seawright, 595 F. Supp. 422 (N.D. Ohio 1984). Furthermore, many of the media comments cited either occurred well before or after the sales tax measure that constitutes the "legislation" in this case, rendering the doctrine largely inapplicable here. However, even if the Court would consider every single statement advanced by the Board, as the Court does in the analysis infra, they would be insufficient to create a genuine issue of material fact as to whether the statute of limitations should be tolled in this case.

> -- have been persuaded to abandon their
> commitments to the league and their fans, and
> unilaterally to move the league's operations
> to new location.  If a league seeks to enforce
> its contractual rights against such moves, it
> faces substantial antitrust risks...

(doc. 128)

Against this backdrop, the Cincinnati tax proposal proceeded to a vote.  The Plaintiffs cite a number of comments made by Brown and others seeking to pass the tax increase on behalf of the Bengals and NFL that it contends represent misleading statements and/or misrepresentations made to pass the sales tax increase.  For example, the Board contends that the Bengals promised voters that it would pay $40 million toward stadium construction and that the stadium revenues would be used to improve the team rather than to merely enrich the Bengals ownership.  In particular, it notes one statement Mike Brown offered on the eve of the stadium vote: "We have to have a competitive team to make this work.  It's not as if we're just taking [this money] home to our piggy bank" (doc. 128).

Along with these statements of goodwill by the Bengals, however, the Board avers that the Defendants made equally ominous comments.  Rick Harrow, a consultant who claimed to have developed the marketing strategy behind the sales tax proposal, summarized it

thus:

> The stick was a moving van in the night: a
> message subtly but clearly put forth -- that
> if the local population showed indifference to
> the proposal, the Cincinnati Bengals could
> become the Cleveland Bengals.  It wouldn't
> take much to lure the team to a new stadium up
> the highway.

(doc. 128).  Whether intentionally or unintentionally – and the former is more likely – the NFL made sure that this path was one the Bengals could take as well.  One month before the sales tax referendum was scheduled for a vote, the NFL put the Bengals at the top of the list of teams with the potential of relocating to Cleveland.[11]  Ultimately, the citizens of Hamilton County approved the sales tax referendum on March 19, 1996.  The source of potential funding now established, all that remained was to negotiate the underlying lease for the proposed stadium.

## C. The Lease Negotiations

Accordingly, negotiations between the parties began for the lease that now serves as the basis of the instant lawsuit.  In

---

[11] In negotiating Cleveland's right to a new or existing franchise, Cleveland officials sought the NFL's agreement that the Bengals would be precluded from moving to Cleveland.  The NFL refused to consent to this condition.

the course of these negotiations, all of the Hamilton County officials, including Commissioners John Dowlin ("Dowlin"), Thomas Neyer ("Neyer"), Robert Bedinghaus ("Bedinghaus"), and Guy Guckenberger ("Guckenberger") and Hamilton County Administrator David Krings ("Krings"), were assisted in their analysis of the prospective lease by a number of capable individuals. The first two – Mitchell Ziets ("Ziets")and Peter Bynoe ("Bynoe") – are national experts "stadium development and major league sports leases" (doc. 123). Ziets is a principal of a Philadelphia public finance firm, and his role was to advise the County as to the propriety of the financial issues implicated by the agreement. Bynoe, on the other hand, is a "Harvard-trained Chicago lawyer" with the firm DLA Piper Rudnick Gray Cary with extensive legal and business experience involving stadia and sports leases (doc. 123).[12]  Finally, the County also employed the services of one of its own counsel, Hamilton County Civil Division Chief James Harper ("Harper"), in evaluating the legal issues presented by the lease.

Many of the facts and circumstances underlying the

---

[12] The Plaintiff contends that both of these individuals have ongoing relationships with the NFL and/or NFL member teams, rendering the value of their advice – and their motivation during the negotiation – somewhat suspect.  It does not, however, offer specifics in making this charge.

negotiations are not disputed by the parties.  First, the Bengals continued to assert that a new, more favorable lease was necessary for the team to remain "competitive and viable."[13]  Significantly, however, every one of the County's representatives and negotiators testified under oath that they understood that the ability of the team to be "competitive" was tied to its revenues under the lease rather than its profits.  Specifically, all of the parties recognized that the Bengals' stated goal was to obtain revenue under the new lease to move it from its current status in the fourth quartile – the lowest quartile – of NFL member clubs' revenue to the second quartile, where it would enjoy revenue roughly in the middle of all of the NFL member teams.  For example, Bynoe, when asked about this issue, proffered the following:

> Q: What was your understanding of what the Bengals believed being competitive meant?

_____

[13] In fact, as the Plaintiff notes, this goal serves as one of the overriding purposes of the lease, as stated in its opening recital:

> By public vote on March 19, 1996, the citizens of Hamilton County passed a one-half percent increase in the Hamilton County general sales tax to keep competitive and viable major league football... by, among other things, the construction of a new football stadium in Hamilton County.

(doc. 128).

-30-

A: I only understand it from a financial point of view.

Q: What was that understanding?

A: Being in the second quartile of NFL teams in terms of revenue.

. . .

Q: . . . What was your understanding [of] what financial stability meant?

A: As I was putting together this proposal, nothing more than that, financial stability.

Q: Does that mean profit? Does profit have anything to do with financial stability?

A: Not necessarily.

. . .

Q: As you went through the negotiations, did you gain a better understanding of what it meant to be financially stable in the National Football League?

A: I think what we agreed upon, the county and Bengals, was their being in the second quartile of the NFL in terms of revenue.

Q: Did you do any independent investigation to determine if, in fact, that would put -- placing the Bengals in that quartile would or would not make them financially stable?

A: No.

Q: Then upon what did you base your determination as to whether putting the Bengals in the second quartile would make them

-31-

financially stable?

A: That's what the Bengals and my client
agreed was their common objective.

(doc. 123).[14]  Not one of the County representatives has indicated

that the revenue information provided by the Bengals and/or the NFL

was in any way incorrect or misleading.[15]

It is also fairly beyond dispute, however, that the

---

[14] This view was echoed by Zeits, Neyer, Bedinghaus, and
Krings in their respective depositions.  Perhaps somewhat
indicative of the thought given this process, however, was
Krings's response to the inquiry of what he understood
"economically viable" to mean: "whatever it took to keep [the
team] in town" (doc. 123).

[15] Arguably the most damning evidence against the Bengals on
this issue is a letter dated February 13, 1996 sent from
Katherine B. Blackburn, Esq. ("Blackburn") on behalf of the
Bengals organization to Bynoe.  In light of the fact that the new
Cleveland deal had elicited "considerable talk and speculation in
the press about how NFL dollars could be brought to bear on the
Cincinnati stadium issue," Blackburn ostensibly thought it
necessary to provide Bynoe with a copy of the interim agreement
between Cleveland and the NFL (doc. 123).  In her letter, she
identified a few points that she felt "st[ood] out" in it,
including that the money the NFL was to contribute under the deal
"is intended to be repaid by whatever team ultimately ends up
playing in Cleveland" and that it was contingent upon a number of
occurrences, including advance commitments to lease a certain
percentage of the planned suites and club seats in the new
stadium (Id.).  She then indicated that the Bengals had been
"profoundly disappointed" by the County's latest proposal, given
that it had "ignored" a number of issues the team had identified
as crucial (Id.).  In this letter, however, she detailed the
initial proposals offered by the County, and made numerous
statements as to how they were unsatisfactory.

-32-

County officials and negotiators did request to review the Bengals'
detailed financial records at some point. For example, they
advanced, in writing, the following request:

> We are in the process of crafting a financing
> plan for the stadium process. In order to
> ensure that we are developing a plan which is
> fair to all parties, given the respective
> Teams' financial situations and the National
> Football League's and Major League Baseball's
> industry economics, we are requesting certain
> information.... The information requested is
> as follows.... Team audited financial
> statements for the past three years including
> P&L, balance sheets, changes in cashflows and
> explanation of extraordinary events (deferred
> compensation, expansion revenues, etc.)....

(doc. 128). The Bengals, however – citing league policy – refused
to offer this information for review.[16]

Significantly, however, two key facts associated with the
Bengals' finances and associated data thereof are undisputed.
First, all of the officials involved in the negotiation agreed that
this information was not material thereto. As noted, they were
negotiating a deal tied to the Bengals' revenues rather than
profitability, and the Bengals' relative profit was seen, by the

---

[16] The Bengals organization has, in both their instant
filings and in oral argument, suggested that it had such
information available and would have provided it if the County
had demanded it. In light of the demands made and the refusal
tendered, this assertion is somewhat dubious.

experts' account, as being irrelevant in determining a professional football franchise's economic stability.  In light of this fact, the County representatives chose not to pursue the information:

> Q: In your view was the Bengals' profitability as opposed to their revenues relevant to the MOU [Memorandum of Understanding] negotiations?
>
> A: It wasn't relevant given the way that we look at sports and others look at sports. It's pretty much understood that you have a [sic] fixed, you can control your expenses, so what you are dealing with when you look at these kinds of deals is revenues and the growth in revenues or revenues falling down.
>
> . . .
>
> Q: Why wasn't it important to you as the County's financial expert during the negotiations leading to the MOU and the Paul Brown [S]tadium lease to know what the Bengals' profits and losses were?
>
> A: Let me answer that first by saying, you know, of course in a normal context we would always want to see the team's financials. Obviously if you are looking at a public company you always see a team's financials. We are dealing with a private company so it's more difficult. Again, we would like it, but it's the norm that teams don't provide that.
>
> However, given that -- given the league that they are operating in and given the rules and restrictions and the revenue sharing, we can get a pretty good sense of [sic] teams' relative competitive position from just looking at the revenues. That's number one.

Number two, as you know, teams run their
businesses differently, and teams -- teams pay
their players differently, teams run their front
offices differently, so a look at a team's
particular expenses does not necessarily give you
a true indication of what a new stadium will do
for them. . . .

It's generally accepted that you as an owner
can control your expenses to a large degree
and the differentiating factor is a
revenue factor, not an expense factor. So
given all that, we were comfortable that we
could understand things by looking at the
team's revenue positioning.

Q: And if you would have thought that
information about the Bengals -- I'm sorry;
the Bengals' profits and losses were
important to the negotiations, would you have
insisted on seeing that information?

A: Yes.

Q: And I take it from your previous answers,
that you did not insist on seeing that
information?

A: That's correct. We asked the first time but
did not insist after that.

(doc. 123).

Second, and perhaps more important, virtually all of the

County officials or negotiators indicated that they <u>knew</u> the

Bengals were profitable at the time of the negotiations.  In fact,

a number of local and national publications regularly reported

estimates of the Bengals' annual profits, some of which the

-35-

negotiation team conceded reviewing in the course of the discussions between the parties.[17]  In retrospect, Ziets conceded being "unsurprised" by the May 2001 <u>Los Angeles Times</u> article containing the Bengals' profits during the 1990s, and Bynoe's answer was even more pointed:

> Q: Mr. Bynoe, during the period that you were negotiating with the Bengals, was it your assumption or understanding that . . . the Bengals were profitable?
>
> A: It was my understanding –
>
> Q: That they were –
>
> A: Yeah, that they were making money.

(doc. 123).  Commissioner Dowlin thought as much as well, and shared his thoughts with his fellow Commissioners.  He testified that he knew "that the Bengals were making all kinds of money" when

---

[17] For example, a June 2, 1995 article in the <u>Cincinnati Enquirer</u> revealed that the Bengals were believed to generate "between $6-8 million" in annual profits (doc. 123).  <u>Financial World</u> published estimates of the NFL member teams' estimated profits and losses annually; the estimate of the Bengals' profits for 1996 was only off by approximately $800,000 ($10.1 million in estimated profit vs. $10.9 million in actual profits).  In fact, as the Defendants note, one of the articles cited in their Second Amended Complaint containing public statements by Mike Brown that allegedly placed substantial pressure on the public and the County officials to execute the instant lease clearly states that, in 1993, "[t]he Bengals remain profitable" (docs. 57, 123).

the new stadium lease – for which he voted – was approved and that the Bengals did not need the new stadium to be "competitive and viable" (doc. 123).[18]  Yet, all of the officials indicated under oath that, in substance, they believed the Bengals negotiated with them in good faith.

Finally, at the time of the negotiations, it is undisputed that the underlying antitrust litigation the league was experiencing – including the highly-publicized case the St. Louis Rams first advanced against the NFL in 1995 – and the associated discussions among communities and Congressmen alike were in full swing and well known to the parties involved.  Bynoe indicated that he had a number of discussions with Krings, Bedinghaus, and the

---

[18] The most nonplussed answer to this line of questioning was offered by Krings:

Q: During the course of the negotiations, was it your assumption that the Bengals were profitable?

A: I don't know whether they were profitable or not. The assumption - Well, I guess the message that I believe that they were trying to deliver, since their revenues were low and that they have - since the revenues were low, there was less money available to do the things they needed to be both economically viable and viable on the field.

(doc. 128).  At best, this testimony reveals that he was relatively unconcerned about the Bengals' profits.

remainder of a "whole negotiating team" about lawsuits involving team relocation and the possible underlying antitrust issues. Commissioners Guckenberger, Bedinghaus, and Krings received a copy of a Congressional Research Service report on the issue; Bedinghaus specifically noted that it was "very informative" and that he would "keep it in mind" as they "moved forward with the financing" of the new stadium (doc. 123).[19] congressional reports summarizing the antitrust issues the league was facing and discussing their impact in the negotiation of the Bengals' lease.  Perhaps most damning, however, are the specific pronouncements that the commissioners and

---

[19] As the Defendants note, this report contained, among other salient points, the following passage:

> [T]he provision of "major-league" professional sports is characterized by monopoly. This restriction of the supply of professional sports franchises intensifies competition among metropolitan areas for the scarce franchises. One way in which this competition manifests itself is by shifting a major portion of stadium facility costs from the private professional sports team to the public sector. If Cleveland, Houston, or New Jersey will not build or offer more favorable financial terms on a new or existing football, baseball, or hockey stadium, perhaps Baltimore, Northern Virginia, or Nashville will.

(doc. 123).

other public officials made on the record regarding the issue.  In
November 1995, for example, Dowlin informed the other Commissioners
of

> private and semi-private conversations [he
> had] with the Mayor of Baltimore [and] the
> Mayor of Chicago. . . .[O]n the subject of
> stadiums, the Mayor of Chicago also had a
> press conference. . . .It was interesting to
> me that. . .the major word in both of these
> was the word extortion. . . .[T]here is a
> lot of conversation among city councils about
> teams trying to use extortion to either
> move somewhere else or to get a better deal
> out of their existing town.

(doc. 123).  As the Defendants note, he later proclaimed that

> it is time that somebody stands up against the
> extortion of ball team owners that they are. .
> . doing nationally.  Now, this word
> "extortion" is the word that has been publicly
> and also privately used -- said to me -- by
> Mayor Daly [sic] of Chicago, [and] Mayor
> Schmoke of Baltimore[.] [Y]ou know, it is just
> time that somebody should stand up and take a
> stand.

(Id.)  Similarly, many news reports indicating that the NFL was a
monopoly and raising these same concerns and issues are part of the
County's records contemporaneous to the negotiation and execution
of the lease.[20]

---

[20] Defendants also note that current Commissioner Todd
Portune – inarguably the initial impetus behind the initial suit
– introduced voluminous materials detailing the NFL's alleged

-39-

Despite all of this, the County continued negotiating the current lease with the Bengals.  To be sure, the Bengals let it be known that, were an acceptable deal not struck, the team could still leave Cincinnati for more fertile economic grounds.  In fact, as the negotiations began, the Bengals' counsel wrote the Board to ensure its members knew the threat was legitimate:

> You indicated that you do not think the Bengals were serious about moving, and that they had no firm deal with Baltimore.  With all due respect, this is a little like the man who plays Russian Roulette and assumes the sixth chamber has no bullet.  Weather forecasters are seldom punished if their forecast is wrong, but we aren't dealing with the weather.  Even putting aside Baltimore, surely you can't be oblivious to the numerous other cities in the pro football market.  My brother lives in St. Louis.  Maybe you need to talk to some folks over there to find out what they had to pay to get pro football back after

---

monopoly, including Congressional and expert testimony and information regarding the leases obtained from other cities, into the Cincinnati public record in January 1996 while a member of City Council.  He also sponsored motions in 1995 and 1996 advancing allegations similar to those advanced in the instant suit.  While he was not involved in the negotiations, and, therefore, his knowledge and/or opinions are largely irrelevant to the determination of the instant motion, he testified under oath that he was "sure" he brought these concerns to the attention of the County (doc. 123).  Furthermore – and perhaps just as telling – he was unable to bring the instant suit until he had been on the Board for more than three years because he lacked the majority vote to do so, despite having all these concerns.

-40-

the Cardinals left.

(doc. 128).   It is clear that many of the County negotiators, including Krings, Guckenberger, and Zeits, felt as though they enjoyed little or no bargaining power as they negotiated the lease.[21] Yet, a review of their testimony reveals that the pressure was not from the Bengals or the NFL but rather the result of the voters who demanded, through their adoption of the sales tax, that the Bengals remain in Cincinnati.  As Krings testified:

> Q. After the passage of the sales tax referendum, you received instructions from the Commissioners, in effect, to get the job done in accordance with the expressed vote of the people; is that right?
>
> A. That's correct.

(doc. 128).  Dowlin conceded as much in his deposition as well:

> Q. Was there any particular reason that [bringing another team to Cincinnati to replace the Bengals] was not explored during the negotiations with the Bengals?
>
> A. I don't recall.  I think it was primarily the fact that the voters, from my standpoint, the voters voted to keep the Reds and the Bengals in town, so that it was a known, we're going to keep them in town.

---

[21] In Zeits's words: "We could have looked down the barrel of a loaded gun and decided not to negotiate the deal if we did, but if we did, we took our chances" (doc. 128).

-41-

(doc. 146). Neyer, when asked about whether the County was under "duress" to enter lease, did as well:

> I guess duress is a higher threshold than I would establish for anything having to do with a professional sports franchise. I mean, yes, there was enormous political pressure to get that deal done. The Bengals were putting the heat on that they were negotiating a tough deal, I understand that, but at the end of the day, I mean, it's a football team, it's not a proprietary heart defibrillator. I mean, yeah, we were under a lot of heat to get it done, but we could have walked.

(doc. 146). Quite notably, the Plaintiff offers no testimony or other evidence – even expert financial testimony – to counter any of these evidentiary submissions or factual assertions. Furthermore – and of equal import – the Plaintiff, besides asking for the financial records in the course of the negotiations, fails to cite a single affirmative effort made during the negotiations or thereafter aimed at obtaining information on the Bengals' profitability or, for that matter, any other financial attribute or statistic.

The Paul Brown Stadium lease was ultimately signed in May 1997. Under the lease, the Plaintiff contends – largely uncontroverted – that the team owes "nominal rent, receives virtually all stadium related revenues, and pays essentially all the construction, operations, maintenance or improvement costs"

-42-

therefor.  (Second Amended Complaint)  Furthermore, it avers that
"[a]fter paying $454 million to build the stadium, Hamilton County
taxpayers will receive just $10 million in today's dollars from
stadium revenues to pay $209 million, again in today's dollars, for
Bengals' expenses and stadium operations and maintenance costs over
the next 33 years."  (Second Amended Complaint).

D. The "Revelation"

        The Second Amended Complaint asserts that the Board
learned of the Bengals and the NFL's "misleading" statements and/or
omissions in May 2001, leading to the discovery of facts necessary
to bring the instant suit.  At that time, the Los Angeles Times
published evidence regarding team revenues and profits submitted as
part of a lawsuit between the NFL and Oakland Raiders owner Al
Davis.[22]  These materials revealed that the Bengals were actually
among the most profitable teams in the 1990s.  For example, in
1996, the team posted the eighth-highest profit in the league of
$10.9 million.  One year later, it posted the ninth-highest profit

_____

        [22] It is worth noting that, apparently, this information was
discoverable and provided to the opposing party as part of an
antitrust lawsuit, just as it was here.  Accordingly, had the
Board had such suspicions and chose to act on them, it would have
been able to discover this same information – to the extent that
they even thought it relevant – in the same way.

of $12.2 million.  The Plaintiff argues that this information –
refused the County during the negotiation process – reveals that
the Bengals did not, in fact, require the stadium deal to be
"competitive and viable."

As part of this argument – and in support thereof – the
Plaintiff claims that, during the course of the negotiations, the
Bengals and the NFL misled Zeits, and therefore the County, as to
the method by which the salary cap (and associated minimum salary)
are calculated.  Specifically, it alleges that the NFL indicated
that the stadium revenues were included in the calculation when, in
fact, they are not.[23]  Instead, the Plaintiff avers that, under the

----

[23] Zeits's testimony provides:

Q. Okay.  And so it was your understanding at the time
you were negotiating that the floor and ceiling of the
salary caps were a percentage of DGR ["defined gross
revenue"]; correct?

A. Yes.

Q. And that DGR included stadium revenues; correct?

A. Yes.

Q. And that's something that the NFL would have told
you?

A. That's something the NFL would have confirmed for
sure, yeah.

-44-

Collective Bargaining Agreement ("CBA"), "the bulk of stadium-related revenue streams - especially those that the Bengals claimed were necessary to remain competitive (stadium club seats and luxury boxes) - are not included as DGR ["defined gross revenue"] when calculating the player salary cap" (doc. 128). This misrepresentation, the Plaintiff alleges, makes the additional revenue from the stadium absolutely unnecessary to render the team "competitive and viable," contrary to the Bengals' earlier assertions, and that it "misled the County and its citizens to believe that the new stadium was necessary to make the Bengals more competitive on the playing field" (Id.).

The NFL, however, offers evidence to demonstrate that this statement - contrary to the Plaintiff's assertion - is entirely correct. In addition to the section of the collective bargaining agreement that the Plaintiff cites, at least one subsequent provision qualifies the calculation of the DGR. Article XXIV, Section 1(a)(iv) of the CBA, colloquially denominated the "spillover" provision, that specifically requires the stadium revenue to be included in DGR if it grows "at a rate faster than

---

(doc. 128).

-45-

DGR (other than network television revenues) - using the ratio that existed in 1992 as a base" (doc. 146).  As a practical matter, this exception has largely become the rule.  Mr. Michael Keenan, the NFL's Senior Director of Labor Finance and the individual primarily responsible for overseeing the determination of the DGR and the resulting salary cap, indicated that "excluded DGR" - including stadium premium revenues including club seats and luxury box rentals - has been "included in DGR" every year since 1993, the year in which the CBA was adopted.  Accordingly, in 2004 alone, $450 million additional was included in DGR, increasing each club's salary cap by more than $9 million (doc. 146).[24]

---

[24] In its reply, the Plaintiff objects to the inclusion of Keenan's affidavit and testimony contained therein and argues that the Court may not consider it pursuant to Fed. R. Civ. P. 37(c)(1).  This is not correct.  First, this additional information was provided to refute specific allegations advanced in the Plaintiff's motion for summary judgment - namely, that the Defendants had provided Hamilton County with false and fraudulent information.  Second, and more to the point, Fed. R. Civ. P. 37(c)(1) does not address this information.  It provides, in relevant part:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information so disclosed.

-46-

Finally, the Plaintiff alleges that despite Mike Brown's protestation and assurances that the he and the other Bengals owners were not taking home the money from the stadium to their respective "piggy banks," that is precisely what they have done. They allege – with some support – that the Bengals' profits and retained earnings have soared since Paul Brown Stadium has opened. Furthermore, they contend that Mike Brown and other Bengals officials correctly contradicted earlier statements made about how additional revenue is necessary to keep the team "competitive and viable."  In an article dated December 2, 2000 in the <u>Cincinnati Enquirer</u>, Mike Brown asserted that

> teams in the NFL today all spend comparable [sic] on players.  It isn't like the times before free agency, when San Francisco was out ahead of everybody.  What they did then was get any player that became a free agent.... In today's NFL with the cap, I think we're all so close that scarcely matters.  We spend

Fed. R. Civ. P. 37(c)(1).  Fed. R. Civ. P. 26(a), in turn, only defines that information required as an initial disclosure - of which this information is not arguably contained – while Fed. R. Civ. P. 26(e)(1) only covers the need to supplement additional disclosures and responses.  To be sure, the parties have objected to various items of discovery.  However, it is not at all clear how the instant testimony is barred from consideration by the application of Fed. R. Civ. P. 37(c)(1), particularly in light of the fact that it is used to respond to a specific allegation by the Plaintiff.

-47-

comparable to what others spend

(doc. 128).  Bengals Executive Vice President Katie Blackburn made

similar comments in a <u>Cincinnati Enquirer</u> article dated October 20,

2002:

> I do think the assumption we would win if we
> just spent more money on players is just
> another false statement to keep getting thrown
> out there, she says.  It's not because we're
> not spending the money.  Obviously, we have to
> do something else, whether it's getting (more)
> out of the guys we got or getting a couple new
> guys in there, maybe a little bit of
> everything.

(<u>Id</u>.)  Plaintiff contends that these statements reveal that the

Bengals' earlier purported justifications for the new lease were

patently false.  Plaintiff filed this lawsuit in response.

**IV. LAW AND ANALYSIS**

Again, it is worth noting that this Order does not visit

the question of whether the terms of the lease are highly

unfavorable to the County or even unconscionable.  It also does not

examine whether the lease is the result of unlawful monopoly power

wielded by the NFL and its member teams; in fact, for the purposes

of this motion, the Court may assume that it is.  The only question

before the Court at this juncture is whether the four-year statute

of limitations for federal antitrust actions expired prior to the

-48-

filing of this suit.  The thorough review of the evidentiary materials offered in this case outlined above and application of the controlling case law thereto reveals that it has.  A full analysis of this issue requires two related inquiries: (1) whether the Plaintiff has advanced sufficient support of its claim that the Defendants fraudulently concealed operative facts of this case and, thereby, concealed Plaintiff's cause of action and, if so, (2) when the Plaintiff[25] knew or should have known of its antitrust claim sufficient to stop the tolling provided by the fraudulent concealment doctrine.  The Court will engage in both.

A.  Fraudulent Concealment

As noted supra, the doctrine of fraudulent concealment contains three elements, all of which must be satisfied before the statute of limitations may be tolled in this case.  The Court will consider each seriatim.

(1) Defendants' Wrongful Concealment of Their Actions

As noted above, the Sixth Circuit requires a plaintiff

---

[25] It is again worth noting that the Board, the Plaintiff in the instant suit, is a continuous entity under state law. Although current members might not have been fully aware of the facts surrounding the negotiation of the lease, the knowledge of the Board members at the time of the execution of the lease is binding upon the current Board.

invoking the doctrine in an antitrust case to demonstrate wrongful, "affirmative acts of concealment" of facts necessary to bring the action.  Pinney Dock, 838 F.2d at 1472; see also Louis Trauth Dairy, 856, F.Supp. at 1236.  This the Plaintiff has utterly failed to show.  It has been unable to identify one statement in the course of negotiations that was false or otherwise misleading.  In fact, the participants have universally testified that they were never misled, misinformed, or otherwise lied to, either before or during the negotiations.  Furthermore, many of the "examples" that Plaintiff cites are simply unsupported by the developed evidentiary record.  For example, Plaintiff makes much of Brown's repeated attestation, even expressed in the lease, that the new stadium and associated lease terms were required to make the team "competitive and viable."  The parties involved in the negotiation, however, uniformly state that they knew this phrase did not invoke the doomsday scenario or, minimally, a need to sustain a profit but rather only the team's needs to increase revenues.  Accordingly, Brown's statement is in no way inconsistent with, or a misrepresentation of, the team's profit position prior to the execution of the new lease.  Similarly, the Defendants have offered uncontroverted evidentiary support disputing Plaintiff's allegation

-50-

that they were misled as to the calculation and allocation of the DRG.[26]  In light of the facts of this case, there are simply no affirmative representations to satisfy this requirement.

Second, even if this Court were to consider the isolated statements made by Brown and other Bengals officials, they do not – even interpreted as the Plaintiffs urge – give rise to a material question of fact supporting a claim of fraudulent concealment.  As noted, the County's representatives recognized that the Bengals were profitable, and it is undisputed that the increases to the DRG as a function of new stadium revenues did increase the salary expenditures each team was required to make under the CBA. It is also undisputed – and was understood by the County representatives – that each team <u>does</u> spend approximately the same on player salaries under the CBA.  Accordingly, Brown's statement that the additional stadium revenues were not only fodder for the team's

---

[26] The Plaintiff correctly has not contended that the Defendants were under any affirmative obligation to provide them with any material requested regarding the Bengals' financial condition or operations.  <u>See</u>, <u>e.g</u>., <u>Blon v. Bank One, Akron, N.A.</u>, 35 Ohio St. 3d 98, 101 (1988)(holding that parties to arm's-length business transactions have no general duty to disclose material facts to each other).

"piggy bank" is true on its face.[27]  Furthermore – and pivotally –
the parties uniformly agreed that any information related to the
Bengals' income was simply irrelevant to the negotiation between
the Bengals and the County.  It is axiomatic that there can be no
<u>wrongful</u> concealment of a fact that the parties agreed was
irrelevant, whether prudently or foolishly.[28]  Accordingly,
Plaintiff simply fails to meet its burden as to this element of the
fraudulent concealment doctrine.

(2) <u>Plaintiff's Resulting Failure to Discover Operative Facts</u>

        The Plaintiff avers that the Bengals' "concealment" of

---

[27] Furthermore, as discussed <u>infra</u>, the Plaintiff's
contention that this statement revealed that the "rule of reason"
was violated and gave rise to antitrust liability is untenable as
a matter of law.  If this is the sole basis upon which the
Plaintiff urges that the statute of limitations be tolled, it is
fatal to its claim.

[28]  Indeed, the Board's argument in this case necessarily
implies that profits, rather than revenues, must be the proper
frame of reference.  For example, when it continually asserts
that the Bengals could have been "viable" without the stadium
deal given that the team was already, and remained, profitable,
the question of the team's revenues is entirely irrelevant.
While it may be arguable as to whether the Board's position is
economically sound, it is entirely undisputed that none of the
negotiating parties considered it to be the determinative or even
a relevant issue.  While the Board may question their collective
wisdom, it may not create a question of fact as to their
collective understanding and knowledge during the execution of
the lease.

team profits prior to the execution of the stadium lease continued until May 2001, when the information was published in the _Los Angeles Times_.  Again, the uncontested facts before this Court conclusively establish that the Plaintiff cannot create a question of material fact as to this point.  A wealth of information was available, and recognized by the County representatives, that the activities of the NFL and its member teams were arguably violative of federal antitrust law.  As the Sixth Circuit has noted in similar circumstances, that is all that is required.  _Dayco_, 523 F.2d 394.  As but one example, the County representatives were all well aware of the Congressional hearings underway at the time of the negotiation of the lease, and some of them even pledged to "keep it in mind" as they "moved forward with negotiation of the lease" (doc. 123).  Accordingly, the Board is deemed aware of the factual basis necessary to give rise to a claim, and therefore, to preclude a finding of fraudulent concealment.

Furthermore, even assuming that the question of whether the Defendants enjoyed the protection of the "rule of reason" under federal antitrust law could not be answered on the facts, it does not provide the Plaintiff the luxury of tolling the statute of limitations until such evidence is revealed.  Despite the Court's

-53-

rather sweeping announcement offered with respect to taxpayer Carrie Davis in its earlier motion to dismiss, it remains that the "rule of reason" imposes a burden-shifting paradigm upon the pleading of a federal antitrust claim.  As the Sixth Circuit recently noted when analyzing the implication of the "rule of reason" on a federal antitrust claim

> requires a court to analyze the history of the restraint and the restraint's effect on competition.  The rule of reason analysis employs a burden-shifting framework. First, the plaintiff must establish that the restraint produces significant anticompetitive effects within the relevant product and geographic markets.  If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects to establish that the alleged conduct justifies the otherwise anticompetitive injuries. If the defendant is able to demonstrate procompetitive effects, the plaintiff then must show that any legitimate objectives can be achieved in a substantially less restrictive manner.

National Hockey League Players Ass'n v. Plymouth Whalers Hockey Club, 325 F.3d 712, 718 (6th Cir. 2003)(internal quotation marks and citations omitted); see also California Dental Ass'n v. FTC, 526 U.S. 756, 775 n. 12 (1999).  Accordingly the statute of limitations begins to run when the plaintiff first learns or should have learned of the initial anticompetitive effects, not when he knows or should have known that the defendant might be unable to produce evidence sufficient to establish that its conduct is protected by

the rule of reason.  The Court could find no case to the contrary, and the vast wealth of caselaw on this issue in antitrust cases, and the burden-shifting paradigms in general, implicitly rejects such an approach.  Indeed the Sixth Circuit's proclamation in Pinney Dock applies with equal force to this case:

> The knowledge that the [defendants] were acting in concert through their joint rate-making activities and any plain understanding of their self-interest was, in our opinion, bound to dispel any uncertainty as to their motive in failing to publish competitive rates.  To hold that a tolling or suspension of the limitation of actions must continue unless or until proof positive existed of a wrong (which might never be established in fact) would abort the policy of the law of repose in statutes of limitations of diligence in the equitable principles of permitting suspension of them.

Id., 838 F.2d at 1478.

(3) Plaintiff's Due Diligence

The Plaintiff's failure to satisfy the first two elements notwithstanding, it has utterly and completely failed to engage in any due diligence to obtain the information regarding the Bengals' financial condition.  To the contrary: In light of the overwhelming evidence and recognition by the Board that the Bengals' and NFL's actions were monopolistic and quite possibly illegal, the County representatives decided to proceed in negotiations for and execution of the lease in the face of the Bengals' refusal to

-55-

provide the information.[29]  While this might have been a realistic approach given their perception that public demand to execute the lease existed, a new Board cannot now attempt to deny this conscious decision was made even if it now ascertains that the political winds of Hamilton County now blow in the opposite direction.[30]  Accordingly, Plaintiff's attempts to invoke the fraudulent concealment doctrine to toll the statute of limitations in this case is unavailing.

B. <u>Knowledge of the Claim</u>

Even assuming, <u>arguendo</u>, that the Plaintiff was able to

---

[29] Although the Bengals were under no obligation to provide the information, a refusal to do so would more likely lead to an inference that information unfavorable to the Bengals' ownership or contrary to its assertions was being concealed than to the contrary.

[30] Furthermore, if the Plaintiff sought to benefit from Todd Portune's efforts in this regard, they have failed to plead any such efforts with the requisite particularity.  <u>See</u> <u>Dayco</u>, 523 F.2d at 394.  It is likely that it did not, however, because it recognized that they were immaterial or, at worst, damaging.  He was not elected to the Board until November 2000, so any efforts were simply irrelevant to the Board's statute of limitations on the underlying lease.  Second, it merely underscores the fact that he was a minority on the Board incapable of advancing the instant suit – despite suspicion and/or knowledge – on the Board's behalf.  He ultimately brought the instant suit as a taxpayer suit.  However, now that the Board has been substituted as Plaintiff, we must examine the Board's due diligence, rather than Portune's.

raise a question of material fact as to the fraudulent concealment issue sufficient to avoid summary judgment against them, there is simply no question of material fact – on this record – that the Board and its representatives knew of the potential for an antitrust claim against the Defendants as of the negotiation and execution of the lease.  Without recounting all of the facts outlined in substantial detail <u>supra</u>, there is simply no triable issue of fact as to whether the County representatives knew or should have known that a potential antitrust claim arose upon the signing of the lease.  As is demonstrated by the substantial publications on this issue generated prior to and contemporaneous with the negotiation and execution of the lease, the Congressional hearings, the County and Cincinnati's own official records, and – not least – the negotiators' own sworn testimony that they were well aware of the reality that the NFL and its member teams were potentially subject to antitrust liability arising from team relocation and stadium negotiation efforts, there is simply no question of fact that the statute of limitations began to run upon the execution of the lease.  The responsible parties actually knew, much less should have known, that they had a cause of action against the NFL as a matter of law.  The Plaintiff offers no

evidence to the contrary.

When considered in conjunction with the Court's earlier finding that the cause of action accrued upon the signing of the lease, the statute of limitations for the instant action expired no later than May 2001, two years prior to the filing of the instant suit.  Accordingly, the antitrust claims are untimely, and they must be dismissed.

C.  Speculative Damages Exception

As an alternative ground justifying relief from the statute of limitations, the Board contends that the "speculative damages" exception applies to this case.  Upon considering the relevant caselaw and the facts of the instant case, the Court concludes that it does not.

In Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971), the Supreme Court reaffirmed the general rule that a cause of action under the "federal antitrust acts. . .accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business." Id., 401 U.S. at 338 (citing cases).[31]  Accordingly,

---

[31]  The Supreme Court also noted that when conspiracies to violate the antitrust laws are at issue, such as in Zenith, and purportedly in this case, "each time a plaintiff is injured by an

-58-

> if a plaintiff feels the adverse impact of an antitrust
> conspiracy on a particular date, a cause of action
> immediately accrues to him to recover all damages
> incurred by that date and all provable damages that will
> flow in the future from the acts of the conspirators on
> that date. To recover those damages, he must sue within
> the requisite number of years from the accrual of the
> action.

Id., 401 U.S. at 339.

The Supreme Court also recognized, however, that in certain circumstances, such as where a competitor was suing for lost profits on the sales of their own goods that suffer as a result of a continuing antitrust violation, it may be impossible to calculate the damages flowing from those violations in any but the most speculative manner. In such a case, "it is hornbook law. . .that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." Id. To prevent aggrieved parties from being forced to choose between the risk of losing their claim to the statute of limitations beginning at the time of

---

act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." Zenith, 401 U.S. at 338. As noted supra, however, the Plaintiff has failed to identify or otherwise argue that any subsequent event in the relationship between the Board and the Defendants, other than perhaps the Bengals' occupancy of the lease, would serve as a subsequent overt act sufficient to give rise to liability. As for the occupancy of the stadium, no additional or subsequent damages arose that already were not expressly fixed by the terms of the lease executed by the parties. Accordingly, this cannot serve as an additional event.

the injury and advancing a claim with the risk that a court, even
if it found a violation, would find the damages too speculative to
award them relief therefor, the Supreme Court concluded that

> [i]n antitrust and treble-damage actions, refusal to
> award profits as too speculative is equivalent to holding
> that no cause of action has yet accrued for any but those
> damages already suffered.  In these instances, the cause
> of action for future damages, if they ever occur, will
> accrue only on the date they are suffered; thereafter the
> plaintiff may sue to recover them at any time within four
> years from the date they were inflicted. . .Otherwise,
> future damages that could not be proved within four years
> of the conduct from which they flowed would be forever
> incapable of recovery, contrary to the congressional
> purpose that private actions serve as a bulwark of
> antitrust enforcement. . .and that the antitrust laws
> fully protect the victims of the forbidden practices as
> well as the public.

Id., 401 U.S. at 339-40 (internal citations and quotation marks
omitted).

As the Defendants properly note, subsequent case law
applying this doctrine has drawn a sharp line delineating between
cases in which the damages arising from unlawful antitrust activity
are truly speculative and those that present "mere uncertainty as
to the amount of damages" arising from such activity.  Barnosky
Oils, Inc. v. Union Oil Co. Of California, 665 F.2d 74, 83 (6th Cir.
1981).  While the former serves to toll the statute of limitations
in antitrust cases, the latter does not.  Furthermore, the courts
have concluded that all that is required to provide a basis for
damages is information permitting a jury "to make a just and
reasonable estimate of the damage based on relevant data." Id.  If

a plaintiff could present "probable and inferential proof" sufficient to provide some reasonable, as opposed to arbitrary, basis for calculating damages, the doctrine will not apply. See Kabealo, 17 F.3d 822, 827 (6th Cir. 1994). In fact, "a plaintiff's own projections and experience during its years of operation are sufficient to provide a reasonable basis for calculating damages." Grand Rapids Plastics, Inc. v. Lakian, 188 F.3d 401, 406-07 (6th Cir. 1999).

        This case clearly falls within the latter category, to the extent that it falls within either of the two categories at all. The Board's antitrust action is based solely upon the terms of the lease allegedly acquired as a result of the Defendants' unlawful anticompetitive practices. In fact, Plaintiff notes that its damages are the "difference between the price [the County]" is obligated to pay under the lease and "the price it should have paid in a free market," and it concedes that any such damages "did accrue at the signing of the lease" (doc. 27). Accordingly, it strains credulity to argue that any of the damages arising therefrom are somehow uncertain; in fact, the Board has failed to identify even one lease provision or one financial consequence with any specificity that could not be ascertained as of the signing of the lease. Given that the Board bears the burden of proving that the exception applies, and, indeed, overcoming a presumption to the contrary, its failure to do so is fatal to its attempts to invoke

the doctrine.  <u>Grand Rapids Plastics</u>, 189 F.3d at 406; <u>Kabealo</u>, 17 F.3d at 827.

Based upon the evidence before the Court, and the arguments made by the parties, the determination of any antitrust damages arising from the lease would be based upon a clear analysis of the 1996 market conditions; it is absolutely unclear how any of this information would be somehow developed in the future that is currently unavailable to the parties.  As in <u>Barnosky Oils</u>, where a contract formed part of the underlying antitrust action, "at the time of the alleged violation and during the following four years a jury could have been permitted to make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." <u>Barnosky Oils</u>, 665 F.2d at 83.  Accordingly, the Board "acted at [its] risk in waiting until the statute of limitations had run" to bring suit, and, consequently, is now time barred from advancing its claims in this Court.  <u>Id</u>., 17 F.3d at 828.

## V. CONCLUSION

To be sure, the lease that Hamilton County enjoys with the Bengals is highly favorable – perhaps egregiously so – to the Bengals.  It may well be that the Hamilton County taxpayers are not enjoying benefits concomitant with their investment in Paul Brown Stadium and in the Bengals' franchise.  It may even be that this lease was the consequence of unlawful anticompetitive behavior by

the Bengals and the NFL.  Despite these truths – if they be truths – this Board cannot advance stale claims.  Whether for good or ill, prior members of the Board negotiated the instant lease with the Bengals fully aware of the possibility that the team and the NFL allegedly wielded unlawful antitrust power to obtain favorable terms under the lease.  They simply failed to object or to otherwise advance a claim on behalf of Hamilton County taxpayers until it was lost to the passage of time.  It should be abundantly clear that the Court's dismissal of Plaintiff's claims is strictly on the question of the statute of limitations and is in no way a decision on the merits of Plaintiff's substantive causes of action under anti-trust law.

Accordingly, the Defendants' First Motion for Summary Judgment (Statute of Limitations) (doc. 123) is GRANTED.  The Plaintiff's Third Motion for Partial Summary Judgment (docs. 127 & 128) is DENIED.  The Court further DENIES Plaintiff's request for Rule 56(f) relief and to Stay Summary Judgment Proceedings (doc. 180).  The federal law claims having been dismissed on the ground of the statute of limitations, the Court DECLINES supplemental jurisdiction over the remaining claims for common law fraud, and for Defendants' Counterclaims.  Accordingly, the Court DENIES WITHOUT PREJUDICE Defendants' Fourth Motion for Summary Judgment on Common Law fraud (doc. 126), DENIES WITHOUT PREJUDICE Plaintiff's Motion to Dismiss Cincinnati Bengals' Counterclaim (doc. 103), and

-63-

DENIES WITHOUT PREJUDICE Defendants' Motion for Summary Judgment on Counterclaims (doc. 121).  In light of this decision, the Court finds it unnecessary to reach all other pending motions in this matter and therefore DENIES: Defendants' Motion to Dismiss (doc. 7), Defendants' Motion to Strike Summary Jury Trial Order (doc. 82), Plaintiff's Motion for Summary Judgment Based on Collateral Estoppel (doc. 120), Defendants' Second Motion for Summary Judgment (Causation)(doc. 124), and Defendants' Third Motion for Summary Judgment (doc. 125).  This case is dismissed from the Court's docket.


        SO ORDERED.

Dated: February 8, 2006        s/S. Arthur Spiegel _____

                               S. Arthur Spiegel
                               United States Senior District Judge